Case No. 23-10682-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

DONALD F. JOHNSON,
Plaintiff-Appellant,

v.

UNITED STATES CONGRESS,
Defendant-Appellee.

---

Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:22-cv-00504-WWB-DAB

## **Brief of Appellant**

Patrick C. Fagan
Jeffrey W. Chen
BONDURANT MIXSON & ELMORE, LLP
1201 W Peachtree St NW, Ste 3900
Atlanta, GA 30309

*Attorney for Plaintiff-Appellant Donald F. Johnson*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Plaintiff-Appellant Donald F. Johnson certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party) that have an interest in the outcome of this particular case or appeal:

- Baker, David A., U.S. Magistrate Judge

- Berger, Wendy W., U.S. District Judge

- Bremer, Celeste F., U.S. Magistrate Judge

- Chen, Jeffrey W., Court-appointed counsel for Appellant

- Fagan, Patrick C., Court-appointed counsel for Appellant

- Irick, Daniel C., U.S. Magistrate Judge

- Kelly, Gregory J., U.S. Magistrate Judge

- Johnson, Donald F.

- United States Congress

- United States Department of Veterans Affairs

## <u>Corporate Disclosure Statement</u>

Pursuant to 11th Cir. R. 26.1-3(b), Counsel for Plaintiff-Appellant Donald F. Johnson certify no publicly traded company or corporation has an interest in the outcome of this case.

#5076856v1

**STATEMENT REGARDING ORAL ARGUMENT**

This case raises constitutional challenges to 38 U.S.C. § 5313, a statute that strips imprisoned veterans of their service-connected disability compensation. Plaintiff Donald F. Johnson—a disabled Army veteran who is currently incarcerated in Florida state prison—appeals the district court's *sua sponte* dismissal of his *pro se* challenge to § 5313.

Johnson respectfully requests oral argument and submits that it would be useful to the Court. As the Court has already recognized, "Johnson presents a novel issue on appeal" because "this Court has not ruled on § 5313's constitutionality." 11th Cir. DE18-2 at 3. Accordingly, the Court found that "Johnson has a nonfrivolous argument that his claim was wrongly dismissed," *id.*, and therefore appointed the undersigned counsel to represent Johnson in this appeal. *See id.*; 11th Cir. DE20-2 at 2.

Because this appeal presents questions of first impression in this Circuit, oral argument may assist the Court by providing it with a better opportunity to understand the parties' arguments before deciding these previously unresolved issues. *Cf. Rose v. Hodges*, 423 U.S. 19, 26 (1975) (Brennan, J., dissenting) ("More importantly, the issue is one of first impression in this Court, and it surely merits briefing and oral argument.").

i

In addition to raising novel legal issues, this appeal also implicates an important right. Service-connected disability compensation is not only crucial to compensating veterans for the disabilities they sustain in service of our country; it is also vital to maintaining our national defense by incentivizing citizens to serve in our military forces. The importance of service-connected disability compensation therefore warrants careful and thorough review of the statute at issue, which irrationally curtails a right earned through service and sacrifice for our nation.

#5076856v1

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...........................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF JURISDICTION.................................................................xi

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE.........................................................................1

    I.     Statement of Facts ............................................................................1

    II.    Procedural History............................................................................3

    III.   Standard of Review ..........................................................................6

SUMMARY OF THE ARGUMENT ....................................................................7

ARGUMENT AND CITATION OF AUTHORITY.............................................11

    I.     The district court erred by dismissing as frivolous Johnson's
          claim that 38 U.S.C. § 5313 is an unconstitutional bill of
          attainder ..........................................................................................11

          A.    Section 5313 specifically targets disabled veterans
                serving time for felony convictions ..........................................12

          B.    Section 5313 legislatively inflicts punishment on
                disabled veterans serving felony convictions ..........................14

              i.     Section 5313 resembles a punitive confiscation of
                       property.........................................................................15

#5076856v1

ii.    Section 5313 does not further nonpunitive purposes because it was only ever intended to punish ................................................................................. 17

C.    Other courts have upheld § 5313 based on cursory analyses ................................................................................. 29

II.    The district court erred by dismissing as frivolous Johnson's claim that 38 U.S.C. § 5313 violates the Fifth Amendment's equal protection guarantee ................................................................................. 33

A.    The Fifth Amendment protects incarcerated veterans from being deprived of significant rights based on irrational classifications and animus ................................................................................. 34

B.    Even before receiving an appointed lawyer, Johnson alleged an arguable—and plausible—equal protection violation ................................................................................. 35

C.    Johnson's allegations and binding precedent provide an arguable (and plausible) basis for an equal protection claim ................................................................................. 39

i.    The congressional record indicates that Congress enacted § 5313 out of a bare desire to harm incarcerated veterans ................................................................................. 39

ii.    Service-connected disability compensation is arguably an important right, which requires the government to show that § 5313 furthers some substantial state interest ................................................................................. 41

iii.    Under whichever standard—substantial state interest or rational basis—§ 5313 is arguably arbitrary and irrational ................................................................................. 44

iv.    Section 5313 draws multiple distinctions that are at least arguably irrational ................................................................................. 49

CONCLUSION ................................................................................. 52

#5076856v1

# TABLE OF AUTHORITIES

**<u>Cases</u>**:

*Battle v. Central State Hosp.*,
    898 F.2d 126 (11th Cir. 1990) ............................................... 1, 6-7, 10, 28, 33

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................36

*Bilal v. Driver*,
    251 F.3d 1346 (11th Cir. 2001) ................................. 1, 7-8, 10, 12, 28, 33, 36

*Consol. Edison Co. of N.Y., Inc. v. Pataki*,
    292 F.3d 338 (2d Cir. 2002) ........................................................................15

*Cummings v. Missouri*,
    77 U.S. (4 Wall.) 277 (1867) ........................................................... 12-14, 16

*Cushman v. Shinseki*,
    576 F.3d 1290 (Fed. Cir. 2009) ...................................................................16

*Erickson v. Pardus*,
    551 U.S. 89 (2007)......................................................................................36

*Estrada v. Shinseki*,
    2013 WL 64489  (Vet. App. Jan. 7, 2013) ...................................................31

*Ex parte Garland*,
    71 U.S. (4 Wall.) 333 (1867) ................................................................. 12-14

*Flemming v. Nestor*,
    363 U.S. 603 (1960)................................................................................ 31-32

*Fletcher v. Peck*,
    10 U.S. (6 Cranch) 87 (1810) .................................................8, 11, 16, 23, 28

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003)....................................................................14

*Graham v. Richardson*,
　403 U.S. 365 (1971)....................................................................48

*Hall v. West*,
　217 F.3d 860 (Fed. Cir. 1999) ............................................ 31-32

*Hughes v. Lott*,
　350 F.3d 1157 (11th Cir. 2003) .......................................................6

*Hutchison v. United States*,
　2016 WL 7173886 (M.D. Fla. May 12, 2016) ..........................4, 45

*Jensen v. Heckler*,
　766 F.2d 383 (8th Cir. 1985) .......................................................31

*Kennedy v. Mendoza-Martinez*,
　372 U.S. 144 (1963)....................................................................18

*Lewis v. Norton*,
　2009 WL 1041815 (E.D. Wis. Apr. 17, 2009) ....................... 31-32

*Mathews v. Lucas*,
　427 U.S. 495 (1976)....................................................................34

*McDermott v. McDonald*,
　2014 WL 4435899 (Vet. App. Sept. 10, 2014) .......................... 29-30, 45, 48

*Nixon v. Adm'r of Gen. Servs.*,
　433 U.S. 425 (1977)...............................................................11, 15

*\*Plyler v. Doe*,
　457 U.S. 202 (1982)...............................................10, 35, 41-42, 44-45, 48

*Rose v. Hodges*,
　423 U.S. 19 (1975)........................................................................i

*Rose v. Rose*,
　481 U.S. 619 (1987)....................................................................42

#5076856v1

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ........................................................6

*Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*,
468 U.S. 841 (1984)......................................................... 8, 13-17

*Sorrow v. United States*,
2020 WL 13280677 (S.D. Tex. Oct. 27, 2020) ............................................31

*Tennessee v. Gardner*,
471 U.S. 1 (1985)........................................................................51

*\*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)...............................................9, 34-35, 38-39, 41, 47, 49

*United States v. Brown*,
381 U.S. 437 (1965)....................................................... 8, 11-13, 15

*United States v. O'Brien*,
391 U.S. 367 (1968)........................................................... 8, 11-12

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000)................................................................34, 36

*Washington v. Glucksberg*,
521 U.S. 702 (1997)......................................................................42

*Weinberger v. Wiesenfeld*,
420 U.S. 636 (1975)......................................................................34

*Whitney v. Heckler*,
780 F.2d 963 (11th Cir. 1986) ..................................................... 8-9, 15, 17

**United States Constitution:**

U.S. Const. art. 1, § 9, cl. 3 ...............................................................xi, 11

## Statutes and Regulations:

38 C.F.R. § 3.4(b)(1).........................................................................18

18 U.S.C. § 1791............................................................................49

28 U.S.C. § 1391...............................................................................xi

28 U.S.C. § 1915A...............................................................................4

28 U.S.C. § 1915(e)(2)(B).....................................................................4

28 U.S.C. § 1915(e)(2)(B)(i)...................................................... 1, 4, 6-7

38 U.S.C. § 1110...............................................................2, 18, 37, 46

38 U.S.C. § 1131.............................................................................18

38 U.S.C. § 1155.........................................................................18, 25

38 U.S.C. § 5313(a).......................................................... 7, 27, 49-50

38 U.S.C. § 5313(a)(1)......................................................................13

38 U.S.C. § 5313(a)(1)(A)....................................................................2

38 U.S.C. § 5313(a)(2)......................................................................28

38 U.S.C. § 5313(b)(1)–(3).................................................................51

Pub. L. No. 85-857 (1958).................................................................46

Pub. L. No. 96-385, § 504(a), 94 Stat. 1528, 1534 (Oct. 7, 1980)
(codified as amended 38 U.S.C. § 5313)................................20, 23

Pub. L. No. 96-473, 94 Stat. 2263 (Oct. 19, 1980)..............................23

#5076856v1

**Other:**

126 Cong. Rec. 18,791 (1980) ................................................................23

126 Cong. Rec. 26,118 (1980) ................................................................24

126 Cong. Rec. 26,122 (1980) ................................................................24

126 Cong. Rec. 27,012 (1980) ................................................................26

126 Cong. Rec. 27,017 (1980) ................................................................26

Gustavus A. Weber & Laurence F. Schmeckebeier,
 *The Veterans' Administration: Its History, Activities and
 Organization* 5 (1934) ...........................................................17, 43

*Jennifer D. Oliva, *Son of Sam, Service-Connected Entitlements, and Disabled
Veteran Prisoners*, 25 GEO. MASON L. REV. 302, 307–08, 317 (2018) ..... 16-22, 24,
 .................................................................................... 27-28, 30,
 ................................................................................39-40, 42-43,
 ................................................................................ 46, 48, 50-51

*Receipt of Social Security Benefits by Persons Incarcerated: Hearing Before the
Subcomm. on Social Security of the House Comm. on Ways & Means*
 96th Cong. 8 (1980).........................................................9, 21, 40

**Review of Compensation and DIC Programs: Hearings Before the Subcomm. on
Comp., Pension, Ins., & Mem'l Aff., H. Comm. on Veterans' Aff.*
 96th Cong. 24 (1980)........................................... 23, 25-27, 30, 40

Romina Boccia, *Triple-Dipping: Thousands of Veterans Receive More than
$100,000 in Benefits Every Year*, The Heritage Found. Issue Brief No. 4295
(2014), http://www.heritage.org/social-security/report/triple-dipping-thousands-
veterans-receive-more-100000-benefits-every-year#_ftn1 .....................................46

VA Office of Policy, Planning, & Preparedness,
 *VA Disability Compensation Program: Legislative History* 8
 (2004).........................................................................18-19, 42-43

Veterans Aff. Op. Gen. Couns. Prec. 10-01,
    VAOPGCPREC 10-01 (May 24, 2001) ......................................................28

Veterans Aff. Op. Gen. Couns. Prec. 3-90,
    VAOPGCPREC 3-90 (Mar. 20, 1990) .......................................................28

*Veterans Benefits Manual* 57
    (Barton F. Stichman et al. eds., 2014) .............................................. 19, 24-25

#5076856v1

## STATEMENT OF JURISDICTION

This Court has subject matter and appellate jurisdiction to decide Johnson's appeal from the district court's dismissal of his constitutional challenges to a federal statute.

This Court has subject matter jurisdiction because Johnson's appeal presents claims that 38 U.S.C. § 5313 violates the United States Constitution, which establishes federal question jurisdiction. *See* DE1 (Complaint); DE6 (Statement in Support of Claim); U.S. Const. art. 1, § 9, cl. 3 (Bill of Attainder Clause); *id.* amend. V (Due Process Clause); 28 U.S.C. § 1391 (Federal Question Jurisdiction).

Moreover, this Court has already determined that it has appellate jurisdiction to decide this appeal. Specifically, in its May 11, 2023 Order, this Court ruled that "this appeal MAY PROCEED as to Appellant's challenge of the district court's November 14, 2022 order dismissing his complaint without prejudice and closing the case." 11th Cir. DE11-2 at 2. In so ruling, this Court also noted that Johnson's "application for a COA"—which he filed on December 14, 2022, within thirty days of the district court's November 14, 2022 order, *see* DE14—"further indicate[s] an intent to appeal from the November 14, 2022 order." 11th Cir. DE11-2 at 2.

#5076856v1

# STATEMENT OF THE ISSUES

This appeal presents the following two issues:

(1)     Did the district court err in dismissing as frivolous Johnson's claim that 38 U.S.C. § 5313 is an unconstitutional Bill of Attainder?

(2)     Did the district court err in dismissing as frivolous Johnson's claim that 38 U.S.C. § 5313 violates the equal protection guarantee of the Fifth Amendment?

The answer to both these questions is yes. Based on the allegations in his *pro se* complaint, Johnson's constitutional challenges to 38 U.S.C. § 5313 "are clearly not so lacking an arguable basis in law as to warrant a dismissal under" the frivolity standard of 28 U.S.C. § 1915(e)(2)(B)(i). *Battle v. Central State Hosp.*, 898 F.2d 126, 130 (11th Cir. 1990). At minimum, Johnson's constitutional claims have "*arguable* merit," *Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001) (emphasis added), and in no event are they "wholly without *a[ny] rational basis* in law." *Battle*, 898 F.2d at 129 (emphasis added).

# STATEMENT OF THE CASE

## I.     Statement of Facts

Plaintiff Donald F. Johnson served in the United States Army as an infantryman. DE1 at 1; DE6 at 1. From October 1983 through March 1985, he was stationed in West Germany—on the frontlines of the Cold War against the Soviet Union and Warsaw Pact. *See* DE6 at 1. While serving in West Germany, Johnson

1

took on "infantry combat training duties" that included "training mission[s] in B[au]mholder and Grafen[wohr]." DE6 at 1. Unfortunately, Johnson was also involved in and witnessed "a deadly combat training exercise." *Id.*

Johnson earned various medals and commendations for his service, and he was honorably discharged from the Army. *Id.* Since 2013, Johnson has been incarcerated in Florida state prison on felony convictions, having been sentenced to forty years in prison. DE1 at 1; DE6 at 1.

In April 2020, a Veterans Affairs medical examiner diagnosed Johnson with post-traumatic stress disorder from his service during the Cold War. DE1 at 1–2; DE6 at 2. Johnson initially received a disability rating of 70 percent based on his post-traumatic stress disorder, but after an appeal, his disability rating was increased to 80 percent. DE6 at 2.

Because Johnson sustained his post-traumatic stress disorder in the line of duty, he was awarded service-connected disability compensation pursuant to 38 U.S.C. § 1110 *et seq. See* DE1 at 1–2. However, because Johnson has been incarcerated on felony convictions for more than sixty days, 38 U.S.C. § 5313 drastically cuts the amount of compensation that Johnson can receive. Specifically, despite his 80 percent disability rating, Johnson can only receive service-connected disability compensation at the 10 percent disability rate. *See* DE1 at 2; 38 U.S.C. § 5313(a)(1)(A).

2

## II.    Procedural History

Johnson filed his complaint *pro se* on March 9, 2022. DE1. Johnson attached a Statement in Support of Claim to his complaint, but because that Statement contained Johnson's date of birth and social security number, the magistrate judge struck the Statement and directed the district court clerk to delete it from the docket. DE2. Consequently, Johnson re-filed a Statement in Support of Claim—this time omitting his personal identifying information—on March 17, 2022. DE6.

Johnson's complaint and Statement raised several constitutional challenges to 38 U.S.C. § 5313. Johnson claimed, *inter alia*, that § 5313 violates both the Bill of Attainder clause, *see* DE1 at 4–7; DE6 at 3–5, and equal protection. *See* DE6 at 3 & 6. And based on these constitutional infirmities, Johnson sought to recover the difference between the compensation he received and the (substantially greater) compensation he would have received in the absence of 38 U.S.C. § 5313. *See* DE1 at 7; DE6 at 6.

On September 23, 2022, the magistrate judge—without requiring any response from the government—issued a Report and Recommendation regarding Johnson's complaint. DE11. The magistrate judge ruled that Johnson's constitutional claims were frivolous; specifically, she found that Johnson had "'failed to provide any . . . persuasive allegation, argument, or citation that would lead the undersigned to conclude that he can present an arguable basis in law'" for

his claims, and therefore held: "'To the extent that the Complaint, liberally construed, alleges colorable, facial constitutional challenges for which the Court has jurisdiction, such claims are nevertheless frivolous.'" *Id.* at 5–7 (alterations adopted) (quoting *Hutchison v. United States*, 2016 WL 7173886, at *4 (M.D. Fla. May 12, 2016)). The magistrate judge recommended that the district court *sua sponte* dismiss Johnson's complaint without prejudice "under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A." *Id.* at 1.

Over Johnson's objections, *see* DE12, on November 14, 2022, the district court adopted the magistrate judge's Report and Recommendation "entirely," without any written analysis. DE13 at 2. The district court *sua sponte* dismissed Johnson's complaint as frivolous. *Id.*

Johnson appealed to this Court. *See* DE14 (Johnson's Motion for Certificate of Appealability); DE16 (Order Denying Certificate of Appealability as Unnecessary); DE17 (Notice of Appeal). On April 5, 2023, this Court issued several Jurisdictional Questions regarding the specific decisions that Johnson sought to challenge on appeal. *See* 11th Cir. DE7-2. After Johnson responded to the Jurisdictional Questions, *see* 11th Cir. DE10, this Court dismissed Johnson's appeal of the district court's order denying his application for a certificate of appealability, but ruled that Johnson's appeal "MAY PROCEED as to [his] challenge of the district

4

court's November 14, 2022 order dismissing his complaint without prejudice and closing the case." 11th Cir. DE11-2 at 2.

Johnson had also moved for permission to appeal *in forma pauperis* in March 2023. DE19. On August 29, 2023, the district court denied Johnson's motion, noting that it had "already determined" that Johnson's "challenge to the constitutionality of 38 U.S.C. § 5313" was "frivolous." DE22 at 2; 11th Cir. DE13-2 at 2. Thus, Johnson filed a consent form authorizing the appellate filing fee to be paid from his prison account, *see* 11th Cir. DE15-2, which this Court construed as a motion for leave to proceed on appeal. *See* 11th Cir. DE16; *see also* 11th Cir. DE18-2 at 2 ("Johnson appealed, and a motion for leave to proceed was construed from his consent form."). Johnson also filed a motion for appointment of counsel. 11th Cir. DE17.

On March 22, 2024, this Court granted Johnson's motion for leave to proceed on appeal and motion for appointment of counsel. 11th Cir. DE18-2 at 3. Because "this Court has not ruled on [38 U.S.C.] § 5313's constitutionality," the Court determined that Johnson "presents a novel issue on appeal" and "has a nonfrivolous argument that his claim was wrongly dismissed." *Id*. In turn, this Court appointed the undersigned counsel to represent Johnson in the instant appeal. 11th Cir. DE20-2.

#5076856v1

### III.    Standard of Review

"A district court's *sua sponte* dismissal for frivolity under 28 U.S.C. § 1915(e)(2)(B)(i) is reviewed for abuse of discretion." *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1169 (11th Cir. 2010) (quotation omitted). "A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner." *Id.* "In making these assessments," this Court "review[s] the district court's factual determinations for clear error, and its purely legal determinations de novo." *Id.*

"It is important to remember that the issue before [this Court] is *not* whether [Johnson's] claim[] . . . state[s] a cause of action," because "to phrase the question in this manner is to conflate the standards of Rule 12(b)(6) with the standards governing" frivolity dismissals. *Battle*, 898 F.2d at 129 (emphasis added). Instead, the relevant question "is simply whether the legal theories raised in [Johnson's] complaint are indisputably meritless" or "lacking an arguable basis in law." *Id.*

Stated differently, though we contend that Johnson's allegations are sufficient to plausibly state at least two constitutional challenges under Rule 12(b)(6), that is a question for a later day. At this stage of the proceedings, the governing question is

whether Johnson's constitutional claims have any "*arguable* merit," *Bilal*, 251 F.3d at 1349 (emphasis added), or whether they are "wholly without a rational basis in law." *Battle*, 898 F.2d at 129. For the reasons discussed below, Johnson easily clears this hurdle.

## SUMMARY OF THE ARGUMENT

Since its founding, the United States has compensated its military veterans for the disabilities they sustain in the line of duty. But in October 1980, Congress enacted 38 U.S.C. § 5313, which drastically reduced service-connected disability compensation to some incarcerated veterans—primarily, those serving time for felony convictions. *See* 38 U.S.C. § 5313(a).

In the proceedings below, Johnson raised constitutional challenges to § 5313. Johnson claimed that § 5313 amounts to an unconstitutional bill of attainder, *see* DE1 at 4–7; DE6 at 3–5, and that it violates the Fifth Amendment's equal protection guarantee. *See* DE6 at 3 & 6. Based on the structure and history of service-connected disability compensation and the statute that strips it away from incarcerated veterans, both of Johnson's claims have at least "arguable merit," *Bilal*, 251 F.3d at 1349, and they "are clearly not so lacking an arguable basis in law as to warrant a dismissal under" the frivolity standard in 28 U.S.C. § 1915(e)(2)(B)(i). *Battle*, 898 F.2d at 130. Nonetheless, the district court *sua sponte* dismissed Johnson's claims as frivolous.

#5076856v1

*See* DE11 at 5–7; DE13 at 2. As will be shown below, the district court abused its discretion in so ruling, and this Court must reverse.

*First*, Johnson's bill-of-attainder claim has more than "arguable merit." *Bilal*, 251 F.3d at 1349. Section 5313 specifically identifies an "easily ascertainable group of people"—disabled and incarcerated felon veterans—for punishment. *United States v. O'Brien*, 391 U.S. 367, 383 n.30 (1968). It makes no difference that this targeted group is "relatively large" in number, *United States v. Brown*, 381 U.S. 437, 461 (1965); the Supreme Court has invalidated statutes targeting similarly large groups of people under the Bill of Attainder Clause. *See id.* at 450 (targeting members of the Communist Party).

Moreover, § 5313 at least arguably constitutes unlawful punishment under the three "guideposts" set forth by Supreme Court precedent. *Whitney v. Heckler*, 780 F.2d 963, 973 (11th Cir. 1986) (citing *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852 (1984)). The statute conceivably "falls within the historical meaning of legislative punishment" because it resembles a classic form of such punishment: punitive confiscation of property. *Id.* at 983; *see Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138 (1810). Further, "the legislative history" of § 5313 "establishes a congressional intent to punish." *See Whitney*, 780 F.2d at 973. That history shows that Congress stripped service-connected disability compensation from incarcerated veterans in response to public outrage over prisoners receiving

#5076856v1

compensation under a *different* federal program—Social Security Disability Insurance. And that history also shows that members of Congress channeled their constituents' hostility by openly denigrating prisoners—indeed, by calling them "animal[s],"[1] "parasite[s],"[2] and the "least deserv[ing]" "segment of society."[3] This congressional record further suggests that § 5313 advances no "nonpunitive legislative purpose" because it was only ever intended to punish. *Whitney*, 780 F.2d at 973. And the nonpunitive rationale that is frequently cited to justify stripping disability compensation from incarcerated veterans—*i.e.*, that they don't "need" the compensation because their basic needs are already being met through incarceration—is illogical given that service-connected disability compensation is not, and was not designed to be, a needs-based benefit in the first place.

*Second*, for many of the same reasons, Johnson's equal protection claim is far from frivolous. Again, the legislative history of § 5313—rife with animosity and cruel epithets towards prisoners—strongly suggests that Congress enacted the statute out of a "bare congressional desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Under binding Supreme Court precedent, that bare desire to harm simply "cannot constitute a legitimate

---

[1] *Receipt of Social Security Benefits by Persons Incarcerated: Hearing Before the Subcomm. on Social Security of the House Comm. on Ways & Means* (hereinafter "*SSDI Prisoner Beneficiary Hearings*"), 96th Cong. 8 (1980).
[2] *Id.*
[3] *Id.* at 88.

9

government interest"—which means it cannot justify treating disabled veterans differently based on their carceral status. *Id.* Moreover, with its deep roots in American history and pivotal role in maintaining our national defense, service-connected disability compensation is at least arguably an important right that the government can curtail only upon "showing that it furthers some substantial state interest." *Plyler v. Doe*, 457 U.S. 202, 230 (1982). But even under the (lower) rational basis standard of review, § 5313 is still arguably irrational because the government interests it supposedly advances, as referenced in the magistrate judge's ruling, are either of dubious legitimacy or unaffected by cutting imprisoned veterans off from their disability payments. And in any event, the statute draws several other distinctions that are also facially irrational—including, for instance, a distinction between imprisoned veteran *felons* (whose disability payments are cut during the period of incarceration) and imprisoned veteran *misdemeanants* (whose disability payments are not cut at all).

At bottom, neither of Johnson's constitutional claims is "wholly without *a[ny] rational basis* in law." *Battle*, 898 F.2d at 129 (emphasis added). And because both claims have at least "arguable merit," the district court erred by dismissing them as frivolous. *Bilal*, 251 F.3d at 1349. This Court should reverse.

#5076856v1

## ARGUMENT AND CITATION OF AUTHORITY

**I.     The district court erred by dismissing as frivolous Johnson's claim that 38 U.S.C. § 5313 is an unconstitutional bill of attainder.**

Contrary to the district court's view, Johnson's bill-of-attainder challenge to 38 U.S.C. § 5313 is not frivolous. A bill of attainder is "a legislative Act which inflicts punishment on named individuals or members of an easily ascertainable group without a judicial trial." *O'Brien*, 391 U.S. at 383 n.30. The United States Constitution unequivocally declares that "no Bill of Attainder . . . shall be passed." U.S. Const. art. I. § 9, cl. 3.

In drafting the Bill of Attainder Clause into the Constitution, the Framers were weary of majoritarian desires to punish. They specifically designed the Clause to protect against—in the words of Chief Justice Marshall—"those sudden and strong passions to which men are exposed." *Fletcher*, 10 U.S. (6 Cranch) at 138. Moreover, the Bill of Attainder Clause "was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition." *Brown*, 381 U.S. at 442. Rather, it reflects the Framers' awareness that legislatures may be creative in crafting punishment, and it therefore must "be read . . . to bar[] legislative punishment, *of any form or severity*, of specifically designated persons or groups." *Id.* at 447–48 (emphasis added). For this reason, "whether the legislative record" of a statute "evinces a congressional intent to punish" lies at the heart of the bill of attainder inquiry. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 478 (1977).

11

As explained below, that Congress enacted an unlawful bill of attainder in 38 U.S.C. § 5313 is at least "arguable"—if not patently plausible. *Bilal*, 251 F.3d at 1349. Section 5313 specifically targets disabled veterans who have been incarcerated for felony convictions, and the legislative history and structure of the statute make clear that it was intended to punish those incarcerated veterans.

## A. Section 5313 specifically targets disabled veterans serving time for felony convictions.

The Bill of Attainder Clause prohibits legislatures from specifically identifying a person or group of persons for statutorily inflicted punishment. A bill of attainder need not directly identify a person by name—it is enough if the statute specifically describes the class of persons under its purview. *See Brown*, 381 U.S. at 442 & 461. Thus, the Supreme Court has invalidated statutes that punished members of the Communist Party, *id.* at 438, as well as those formerly associated with the Confederacy. *See Cummings v. Missouri*, 77 U.S. (4 Wall.) 277, 324 (1867); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1867).

At minimum, 38 U.S.C. § 5313 arguably satisfies the specificity criteria for bills of attainder. Like the statutes that the Supreme Court invalidated in *Brown*, *Cummings*, and *Garland*, § 5313 targets a specific, "easily ascertainable group of people"[4]: veterans entitled to service-connected disability compensation who are

---

[4] *O'Brien*, 391 U.S. at 383 n.30.

#5076856v1

incarcerated for a "period in excess of sixty days for conviction of a felony." 38 U.S.C. § 5313(a)(1). Moreover, although incarcerated disabled veterans may be large in number, the same is true of the targeted groups in *Brown*, *Cummings*, and *Garland*. *See also Brown*, 381 U.S. at 461 ("It was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people, sometimes by description rather than name.").

Additionally, one feature that all these groups have in common is that once the targeted status attaches, it is irreversible—there is nothing an individual can do to avoid the statute's punishment.[5] Irreversibility can be critical to the specificity analysis. In *Selective Service System v. Minnesota Public Interest Research Group*, a group of male students challenged § 12(f) of the Military Selective Service Act, which denied federal financial assistance to male students who failed to register for the draft. 468 U.S. at 850. The Supreme Court determined that § 12(f) was not a bill of attainder because the attribute to which the statute attaches is easily remedied. *Id.* at 850–51. "Far from attaching to . . . past and ineradicable actions, ineligibility for Title IV benefits is made to turn upon continuingly contemporaneous fact which a student who wants public assistance can correct." *Id.* at 851 (internal quotations and

---

[5] The statute in *Brown* targeted "not only present members of the Communist Party, but also anyone who has within the past five years been a member of the Party." 381 U.S. at 458. Thus, Communist Party members could *not* "escape from the class of persons [targeted] by Congress simply by resigning from the Party." *Id*.

citations omitted). Being unregistered for the draft, the Court determined, is "clearly distinguishable" from the irreversible statuses targeted by the unlawful bills of attainder in *Cummings* and *Garland*. *Id.* at 850.

Irreversibility of status is therefore significant to the specificity prong because it reveals the intent behind the sanction. If the sanction attaches to a reversible status, as was the case in *Selective Service System*, it suggests that Congress meant for the sanction to incentivize voluntary reversal of the status. *Id.* at 849–50. Far from an "absolute barrier," a sanction that encourages compliance allows the affected individuals to alter their status and no longer be subject to the alleged punishment. *Id.* at 850–51.

Section 5313 makes no such allowance. Like former Communists, Confederates, and Confederate sympathizers, incarcerated disabled veterans can do nothing to reverse their status. In other words, "ineligibility for [full veterans' disability] benefits is made to turn upon" "ineradicable actions." *Selective Serv. Sys.*, 468 U.S. at 851. Thus, § 5313 inflicts punishment on a class of people whose status is irreversible.

## B. Section 5313 legislatively inflicts punishment on disabled veterans serving felony convictions.

"[T]he principal touchstone of a bill of attainder is punishment." *Foretich v. United States*, 351 F.3d 1198, 1218 (D.C. Cir. 2003). Courts look to three "guideposts" to determine whether a statute inflicts constitutionally forbidden

punishment: "if (1) the statutory penalty falls within the historical meaning of legislative punishment, (2) the statute fails to further any nonpunitive legislative purpose, or (3) the legislative history establishes a congressional intent to punish." *Whitney*, 780 F.2d at 973 (citing *Selective Serv. Sys.*, 468 U.S. at 852).

A statute need not meet all these guideposts to inflict unconstitutional punishment; rather, the guideposts provide "the evidence that is weighed together in resolving a bill of attainder claim." *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338 (2d Cir. 2002) (citing *Nixon*, 433 U.S. at 473–78).

Nonetheless, as to § 5313, all three guideposts point in the direction of unlawful punishment.

### i. Section 5313 resembles a punitive confiscation of property.

The first guidepost—whether "the statutory penalty falls within the historical meaning of legislative punishment," *Whitney*, 780 F.2d at 973—is only a starting point. As the Supreme Court has explained, the Framers intended the Bill of Attainder Clause to prohibit *both* the historical punishments they knew and any novel forms of punishment that future legislatures might devise. *See Brown*, 381 U.S. at 442–46 (discussing the Framers' understanding of the Bill of Attainder Clause).

That said, § 5313 bears more than a passing resemblance to a historically quintessential form of legislative punishment: punitive confiscation of property. To

elaborate, while at common law there was a distinction between bills of attainder and bills of pains and penalties—the former legislatively inflicting death and the latter punishing by lesser means—"the Constitution proscribes" both. *Selective Serv. Sys.*, 468 U.S. at 852 (citing *Cummings*, 71 U.S. (4 Wall.) at 323). Consequently, as Chief Justice Marshall wrote for the Supreme Court, a "bill of attainder may affect the life of an individual, *or may confiscate his property*, or may do both." *Fletcher*, 10 U.S. (6 Cranch) at 138 (emphasis added).

The compensation-stripping scheme in § 5313 resembles the punitive confiscation of property characteristic of historical bills of pains and penalties. A veteran eligible for service-connected disability compensation has a protected property interest in the entitlement. "Veteran's disability benefits are nondiscretionary, statutorily mandated benefits," and as such, "entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment." *Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009).

Moreover, history makes clear that veterans' disability compensation is—and has always been—an earned right that is integral to the preservation of this country. Service-connected disability compensation has deep roots in our nation's history. As Professor Jennifer Oliva detailed in her critical analysis of § 5313, the United States has provided disability compensation to its veterans since before its founding. *See* Jennifer D. Oliva, *Son of Sam, Service-Connected Entitlements, and Disabled*

*Veteran Prisoners*, 25 Geo. Mason L. Rev. 302, 307–08, 317 (2018). Starting in 1776, the Continental Congress promised disability payments "to encourage enlistment in and prevent desertion from the Continental Army." *Id*. (citing Gustavus A. Weber & Laurence F. Schmeckebeier, *The Veterans' Administration: Its History, Activities and Organization* 5 (1934)). And as two historians concluded, this compensation "'probably prevented the dissolution of the Army and the loss of the Revolutionary War.'" *Id.* at 308 (quoting same).

Central to the functioning of American society, the practice of compensating veterans for the disabilities they sustain in the line of duty continued to develop throughout the life of our nation. *See* Oliva, *supra*, at 308–12. And crucially, for almost the entirety of its history, the United States paid service-connected disability compensation to its veterans *regardless of their carceral status*; it was not until 1980 that we began to strip justice-involved veterans of these benefits. *Id.* at 317.

 Because § 5313 confiscates compensation earned through service and sacrifice to country, its resemblance to a bill of pains and penalties should raise this Court's constitutional alarm as it considers the remaining guideposts.

### ii.     Section 5313 does not further nonpunitive purposes because it was only ever intended to punish.

As for the two remaining punishment guideposts—nonpunitive purpose and congressional intent—courts commonly address them together because one informs the other. *See Selective Serv. Sys.*, 468 U.S. at 853–56; *Whitney*, 780 F.2d at 974. If

17

the legislative record shows a clear desire to punish, the statute frequently lacks a legitimate nonpunitive purpose. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169–84 (1963). In those situations, any proffered nonpunitive purpose is often pretextual. *See id.* at 169 ("[A] detailed examination [of nonpunitive purposes and other factors] is unnecessary, because the objective manifestations of congressional purpose indicate conclusively that the provisions in question can only be interpreted as punitive.").

Such is (at least arguably) the case with § 5313. The legislative record evinces a congressional intent to punish, and the purported nonpunitive reason for stripping disability compensation away from incarcerated veterans cannot be squared with the core purpose of compensating disabled veterans in the first place, as reflected in the structure of the compensation scheme.

Starting with structure, the service-connected disability program provides a monthly payment to disabled veterans, the amount of which is determined by a disability rating. 38 U.S.C. §§ 1110, 1131, 1155; 38 C.F.R. § 3.4(b)(1). The VA Schedule for Rating Disabilities ("VASRD") assigns veterans a percentage disability rating based upon the average impairment of earning capacity someone with the disability might possess. 38 U.S.C. § 1155; *See* Oliva, *supra*, at 312. However, each incremental increase in disability rating corresponds with an exponential increase in compensation, suggesting that "Congress' intent is not just economic

compensation," but also "compensation for loss in quality of life." VA Office of Policy, Planning, & Preparedness, *VA Disability Compensation Program: Legislative History* 8 (2004).

Other structural features of the program further confirm that service-connected disability compensation functions to compensate disabled veterans for loss in quality of life, rather than as strictly economic compensation.[6] Most conspicuously, in determining compensation amounts, nothing in the statutory scheme allows for the VA to consider a veteran's actual need, income, resources, or capacity to work. Oliva, *supra* at 314 n.70 (citing *Veterans Benefits Manual* 57 (Barton F. Stichman et al. eds., 2014)). Thus, "the VA's disability compensation program does not—and is not even intended to—compensate a veteran based on his or her individual need for room or board or any other expenses." Oliva, *supra*, at 337 (citing same). In this way, the service-connected disability program differs from other federal disability benefit programs, including workers' compensation and the Social Security Disability Insurance ("SSDI") program. *See* Oliva, *supra* at 314. This difference also reflects the program's historic purpose: veterans' disability

---

[6] *See, e.g.*, *id.* at 2 ("Congress has set forth certain presumptions of eligibility for disability compensation and higher benefit levels for certain disabling conditions such as loss of a limb that reflect humanitarian concern about quality of life.").

benefits are intended to compensate veterans for the bodily sacrifices they made in service of our country, not to remedy variable present conditions.

Consistent with this principle, the United States provided disability compensation to all qualifying veterans—regardless of their incarceration or criminal conviction status—for more than 200 years. *See id.* at 317. Then, for the first time in American history, Congress reversed course in October 1980 by enacting § 5313.[7] And tellingly, that about-face was prompted by a media-fueled uproar over a *different* federal disability benefit program—SSDI—which ignited fierce collective judgment that prisoners are "animals" and "parasites" wholly undeserving of federal benefits. *See id.* at 322 & 327.

To elaborate, in 1979 and 1980, public outrage erupted over sensationalized media stories describing infamous prisoners collecting SSDI benefits. *Id.* at 323. These stories dramatized accounts of "mass murderers, child molesters, and other notorious prison inmates," including New York City "Son of Sam" killer David Berkowitz, collecting substantial benefits from the SSDI program. *Id.* (internal quotation marks and citation omitted).

In turn, Congress fixated on these individual, but well-publicized, accounts when it deliberated over whether to cut SSDI benefits to prisoners generally. Indeed,

---

[7] *See* Pub. L. No. 96-385, § 504(a), 94 Stat. 1528, 1534 (Oct. 7, 1980) (codified as amended 38 U.S.C. § 5313).

#5076856v1

Berkowitz's name was invoked on more than thirty separate occasions during one subcommittee hearing alone. *See id.* at 326–27 & n.154 (citing *Receipt of Social Security Benefits by Persons Incarcerated: Hearing Before the Subcomm. on Social Security of the House Comm. on Ways & Means* (hereinafter "*SSDI Prisoner Beneficiary Hearings*"), 96th Cong. 3, 8, 10–12, 14–20, 25, 48, 61, 81, 83, 85–86, 93 (1980)).

During those hearings, members of Congress testified to their and their constituents' outrage. Speaking of Berkowitz, Congressman William G. Whitehurst—lead sponsor of the House bill repealing prisoner SSDI benefits— brazenly referred to prisoners as "animal[s]":

> It is ridiculous for someone like [Berkowitz] to be allowed to collect several hundred dollars each month in social security benefits because of some asinine qualification procedure. For what possible reason can there be in paying **an animal like this** from our country's already strained social security fund?

*SSDI Prisoner Beneficiary Hearings* at 8 (statement of Rep. Whitehurst) (bolding added). In the same breath, he also equated prisoners with "parasite[s]":

> Have our laws become so inflexible that our social security administrators must bend over backwards to make sure **another parasite** is added to suck the life out of the social security host? I hope to God they are not.

*Id.* (bolding added).

#5076856v1

Many other members of Congress expressed the same antipathy towards prisoners, further elucidating the punitive intent behind the legislation.[8] Indeed, one Congressman specifically highlighted a letter from a constituent urging that SSDI benefits must be stripped from all prisoners, regardless of whether they had "earned" those benefits "prior to conviction." *Id.* at 88 (statement of Rep. Robert Walker). That same Congressman also admonished that prisoners were the "least deserv[ing]" "segment of society." *Id.*

Importantly, this wave of animosity *also* prompted Congress to enact § 5313, thereby stripping incarcerated veterans of their service-connected disability payments. As Professor Oliva details in her article, "[d]isabled veteran prisoners were targeted by Congress for disability benefit reductions at least in part—if not entirely—because of the public uproar over Son of Sam's and other notorious prisoners' alleged abuses of the SSDI program." Oliva, *supra*, at 331. In other words, "[b]y all accounts, it appears that disabled veteran prisoners simply got caught in the

---

[8] For example, Congressman J.J. Pickle opened the same hearing by emphasizing that "press reports that perpetrators of heinous crimes can receive social security benefits while in prison have outraged many reasonable people, both in and out of Congress." *Id.* at 2. Similarly, Senator Malcolm Wallop highlighted the "flood of mail" he had received from constituents expressing "outrage[] at the notion that a convicted criminal could receive disability benefits while in prison." *Id.* at 4. And Congressman Barber Conable conveyed that Berkowitz's receipt of SSDI benefits "ha[d] become a focal point of unhappiness" with his constituents because Berkowitz was incarcerated "in [his] district." *Id.* at 3.

#5076856v1

wake of the 1980 push to eliminate inmate receipt of SSDI program benefits." *Id.* at 341.

Thus, Congress passed § 5313 and the SSDI-stripping statute within two weeks of each other. *Compare* Pub. L. No. 96-385, § 504(a), 94 Stat. 1528, 1534 (Oct. 7, 1980) (codified as amended at 38 U.S.C. § 5313), *with* Pub. L. No. 96-473, 94 Stat. 2263 (Oct. 19, 1980). And the legislative history for § 5313 similarly reflects preoccupation with the public outrage over prisoners receiving federal benefits.[9] But of course, these vindictive manias were precisely the "sudden and strong passions" that the Framers sought to protect against when crafting the Bill of Attainder Clause. *Fletcher*, 10 U.S. (6 Cranch) at 138.

To be sure, those who supported stripping incarcerated veterans of their disability compensation tried to articulate a nonpunitive reason for doing so. In their view, the purpose of service-connected disability compensation is to ensure that a disabled veteran's basic needs are being met, but disabled veterans "do not 'need'

---

[9] *See* 126 Cong. Rec. 18,791 (1980) (statement of Congressman Sonny Montgomery: "We have read in the newspapers where we have some individuals who are serving sentences for murder and other major criminal offenses who are drawing Federal benefits. In some cases, these individuals are drawing veterans benefits."); *Review of Compensation and DIC Programs: Hearings Before the Subcomm. on Comp., Pension, Ins., & Mem'l Aff., H. Comm. on Veterans' Aff.* (hereinafter "*Review of Comp. and DIC Programs Hearing*"), 96th Cong. 24 (1980) (Rep. Montgomery: "Well, there has been some publicity on it, and I think we are going to have to straighten it out. We can't let a man in prison who has done horrible, horrible things, draw $800 a month.").

#5076856v1

[that] compensation while incarcerated because the government is paying for their room and board"—so it makes sense to suspend the compensation during periods of incarceration. Oliva, *supra*, at 320. Thus, Congressman Sonny Montgomery—principal sponsor of the House bill that eventually became § 5313—expressly justified cutting disability compensation from incarcerated veterans on the ground that the "economic detriment caused by a disability *is not felt* by [incarcerated veterans] *during long periods of confinement*." 126 Cong. Rec. 26,118 (1980) (emphases added).[10]

But that reasoning relies on a false premise: the service-connected disability program has never been a needs-based program; it "does not—and is not even intended to—compensate a veteran based on his or her individual need for room or board or any other expenses." Oliva, *supra*, at 337. As discussed above, service-connected disability compensation is not paid according to need, and nothing in the statutory or regulatory framework allows the VA to pay more or less compensation based on a veteran's actual level of need, income, resources, or capacity to work. *See* Oliva, *supra*, at 314 n.70 (citing *Veterans Benefits Manual* at 57). Rather, the

---

[10] Congressman Chalmers Wylie similarly remarked that "[i]n the case of imprisonment, when a prisoner is being fully supported by tax dollars that fund the penal institution, it becomes ludicrous to continue payment of benefits designed to help him maintain a standard of living." 126 Cong. Rec. 26,122 (1980).

amount of compensation a disabled veteran receives is determined *solely* by their disability rating. *See* 38 U.S.C. § 1155.

In this way, the very structure and purpose of the service-connected disability program undermines Congressman Montgomery's needs-based rationale for stripping that compensation from incarcerated veterans. And notably, that is exactly what the then-Director of the Department of Veterans Benefits, J.C. Peckarsky, told Congressman Montgomery during an April 1980 congressional subcommittee hearing.

At the hearing, Congressman Montgomery asked Director Peckarsky: "What would you think of a change in the law that would cut off or reduce compensation . . . payments to a veteran . . . who is in prison?" Director Peckarsky disapproved: "The law has *never* provided for reductions of disability compensation during a veteran's confinement in prison, presumably on the ground that compensation is *not a direct needs benefit*, but is rather an average impairment of earning capacity benefit." *Review of Comp. and DIC Programs Hearing* at 26 (emphases added). And when Congressman Montgomery pressed the Director to articulate his "argument against" stripping imprisoned veterans of their disability compensation, Director

Peckarsky candidly responded: "[C]ompensation has never been subject to reduction because the veteran's needs are satisfied some other way." *Id.*[11]

In this straightforward manner, Director Peckarsky exposed the fallacy in Congressman Montgomery's needs-based rationale for cutting imprisoned veterans off from their hard-earned disability compensation. But Congressman Montgomery's response was even more revealing, because it all but confirmed the punitive intent behind his bill. Specifically, Congressman Montgomery did not even try to defend his needs-based argument, nor did he offer any other nonpunitive justifications for his bill. Instead, after Director Peckarsky identified the flaw in Congressman Montgomery's logic, Congressman Montgomery insisted that incarcerated veterans must nonetheless be stripped of disability compensation because of the recent wave of "publicity" and the "horrible, horrible things" that prisoners have done:

> Well, there has been some publicity on it, and I think we are going to have to straighten it out. **We can't let a man in prison who has done horrible, horrible things, draw $800 a month**.

---

[11] To be clear, Director Peckarsky was not the only one to point out the flaw in Congressman Montgomery's needs-based reasoning. Senator Alan Cranston remarked that Congressman Montgomery's "House-passed provision not only raised questions of fundamental fairness but also *threatened basic principles underlying the service-connected compensation programs*." 126 Cong. Rec. 27,012 (1980) (emphasis added). Similarly, in noting his initial objections to the bill, Senator Strom Thurmond opined "that the economic or social status of the veteran should not determine his receipt of compensation," because if it did, "receipt of compensation would be needs-based and not totally related to a disability incurred while in service." 126 Cong. Rec. 27,017 (1980).

#5076856v1

*Review of Comp. and DIC Programs Hearing* at 26 (bolding added).

In short, because "need is not a factor in ascertaining whether [or to what extent] a veteran who is disabled in the line of duty is entitled to service-connected disability compensation," the "needs-centric rationale" that proponents of § 5313 "advanced to justify" taking that compensation away from incarcerated veterans "is disingenuous." Oliva, *supra*, at 339. Instead, as the congressional record demonstrates, the true motivation behind passing § 5313 was simply—and exclusively—to harm and punish. *See Review of Comp. and DIC Programs Hearing* at 26 ("We can't let a man in prison who has done horrible, horrible things, draw $800 a month.").

In addition to this damning legislative history, § 5313 is also riddled with exceptions that further discredit the notion that it advances nonpunitive purposes. First, the statute exempts veterans incarcerated for misdemeanor convictions, regardless of the length of their sentence or the nature of the crime. *See* 38 U.S.C. § 5313(a). Because the needs of felons and misdemeanants alike are already being met through incarceration, under a needs-based rationale, § 5313 should strip disability compensation from *both* groups of offenders. But that is not what § 5313 does. Indeed, that § 5313 specifically targets the more "serious" offenders (*i.e.*, felons rather than misdemeanants) only further suggests that the statute was intended to punish.

#5076856v1

Second, and similarly, the statute exempts pretrial detainees, veterans who are incarcerated in foreign prisons, and veterans who are confined in mental institutions after being found not guilty by reason of insanity. *See* 38 U.S.C. § 5313 (stating that the statute applies only to those serving felony convictions); Oliva, *supra*, at 318 & nn.106–07 (citing 38 C.F.R. § 3.665(c)(3); Veterans Aff. Op. Gen. Couns. Prec. 10-01, VAOPGCPREC 10-01 (May 24, 2001); and Veterans Aff. Op. Gen. Couns. Prec. 3-90, VAOPGCPREC 3-90 (Mar. 20, 1990)). Again, the needs of *all* these groups of justice-involved veterans are already being met through incarceration or confinement, yet § 5313 does not take away disability compensation from any of these groups.

Third, the statute exempts veterans who are participating in a work-release program or residing in a halfway house. 38 U.S.C. § 5313(a)(2). But if anything, those veterans are even more lacking in need, which further undermines the notion that § 5313 strips compensation on needs-based grounds.

In sum, that § 5313 was intended to punish and lacks a legitimate nonpunitive purpose is more than "arguable," *Bilal*, 251 F.3d at 1349—and certainly "not so lacking an arguable basis in law as to warrant a dismissal" as frivolous. *Battle*, 898 F.2d at 129. The legislative record reveals that the passage of § 5313 was born of "those sudden and strong passions to which men are exposed," *Fletcher*, 10 U.S. (6 Cranch) at 138, and spearheaded by a bare desire to harm.

#5076856v1

### C.    Other courts have upheld § 5313 based on cursory analyses.

While this Court has never addressed whether § 5313 constitutes an unlawful bill of attainder, other courts have upheld the statute against such challenges. However, those decisions that we have uncovered—along with the magistrate judge's ruling below—are uniformly perfunctory. None of them seriously grapples with the various factors in the bill-of-attainder analysis, and none of them engages in any substantial depth with the legislative history of § 5313—which, as outlined above, plainly evinces a congressional intent to punish.

For instance, only one of those decisions even bothers to identify a nonpunitive purpose that § 5313 supposedly advances. *See McDermott v. McDonald*, 2014 WL 4435899 at *2 (Vet. App. Sept. 10, 2014). And that decision disposes of the issue in a single sentence; it notes that suspending a *different* kind of payment ("pension benefits") to imprisoned veterans "furthers nonpunitive legislative goals of preventing duplication of subsistence payments and contraband purchases within prisons," and it then assumes that suspending service-connected disability compensation furthers those same goals. *Id.*

But contrary to *McDermott*, § 5313 does not rationally relate to either of those goals. First, cutting service-connected disability payments to incarcerated veterans does nothing to "prevent[]" the "duplication of subsistence payments" because—as discussed at length above—service-connected disability payments are simply *not*

29

"subsistence payments" at all. *Id.*; *see supra* at 18-20 & 24-27. Service-connected disability compensation "is *not* a direct needs benefit," and it "has never been subject to reduction because the veteran's needs are satisfied some other way." *Review of Comp. and DIC Programs Hearing* at 26 (statement of J.C. Peckarsky, Director of the Department of Veterans Benefits) (emphasis added). Therefore, the "needs-centric rationale" for stripping that compensation from incarcerated veterans, as echoed in *McDermott*, "is disingenuous." Oliva, *supra*, at 339.

Second, based on Johnson's allegations—which must be accepted as true at this stage of the proceedings—§ 5313 also does nothing to prevent "contraband purchases within prisons." *McDermott*, 2014 WL 4435899, at *2. As Johnson explained in his pleadings, disabled veteran prisoners do not receive their disability payments in cash. Instead, prisons "ubiquitously operate as a cashless system" where "prison identification cards are prisoners debit cards." DE6 at 5. Consequently, there is "no possible way" for service-connected disability compensation to be misappropriated amongst prisoners or used to purchase contraband within prison. *Id*. And as a result, taking this compensation away from incarcerated veterans can have no effect on contraband purchases in prison.

Beyond *McDermott*, the remainder of the decisions upholding § 5313 against bill-of-attainder challenges generally do so by baldly concluding that § 5313 inflicts no punishment, without *any* inquiry into punitive intent or any of the other

punishment guideposts. *See, e.g.*, *Hall v. West*, 217 F.3d 860 (Fed. Cir. 1999); *Lewis v. Norton*, 2009 WL 1041815, at *3 (E.D. Wis. Apr. 17, 2009), *aff'd*, 355 F. App'x 69 (7th Cir. 2009); *Estrada v. Shinseki*, 2013 WL 64489 at *12 (Vet. App. Jan. 7, 2013), *adhered to on reconsideration,* 2013 WL 1800284 (Vet. App. Apr. 30, 2013); *Sorrow v. United States*, 2020 WL 13280677, at *6 (S.D. Tex. Oct. 27, 2020), *report and recommendation adopted*, 2021 WL 8441967 (S.D. Tex. Feb. 9, 2021).

Even worse, some of those decisions mistakenly characterize the Supreme Court's opinion in *Flemming v. Nestor*[12] as suggesting that "the suspension of a noncontractual benefit cannot be considered a punishment." *Hall*, 217 F.3d 860 (citing *Flemming*, 363 U.S. at 617); *see also Estrada*, 2013 WL 64489, at *12 (same). Indeed, that is exactly what the magistrate judge below declared in rejecting Johnson's bill-of-attainder claim. Quoting *Jensen v. Heckler*—which itself cited *Flemming*—the magistrate judge ruled that § 5313 "is not a bill of attainder 'because the suspension of a noncontractual benefit cannot be considered a punishment.'" DE11 at 7 (quoting 766 F.2d 383, 386 (8th Cir. 1985)).

But *Flemming* established no such categorical rule. Quite the opposite, in *Flemming*, the Supreme Court explained that each of its landmark bill-of-attainder precedents "turned on its own *highly particularized context*"—context that can include a statute's "specific Congressional history" or "historical evolution," or even

---

[12] 363 U.S. 603 (1960).

the Court's own "first-hand acquaintance with" "the fierce passions" surrounding a statute. 363 U.S. at 615–16 (emphasis added). And accordingly, the Supreme Court made sure to examine the legislative history of the benefits-suspending provision at issue in *Flemming* before concluding that it did not amount to an unlawful bill of attainder. *See id.* at 618–20.

*Flemming* plainly did not establish—or even suggest—a blanket rule that suspending noncontractual benefits can never constitute punishment. Indeed, even some of the courts that have rejected bill-of-attainder challenges to § 5313 have recognized that, properly construed, *Flemming* merely signifies that the "denial of a noncontractual government benefit, *absent evidence of a congressional intent to punish*, is not illegally-imposed punishment." *Lewis*, 2009 WL 1041815, at *3 (emphasis added); *see also Hall*, 217 F.3d at 860 (citing *Flemming* for the proposition that "the sanction of the mere denial of a noncontractual benefit *without more* did not evidence a congressional intent to punish" (emphasis added)).

But neither the magistrate judge's ruling below nor any of the other bill-of-attainder decisions that we are aware of examined *any* "evidence of a congressional intent to punish" underlying § 5313—let alone the substantial historical, statutory, and structural evidence that Johnson has outlined above. *Lewis*, 2009 WL 1041815, at *3. In other words, none of those decisions analyzed the "particularized context" of § 5313. *Flemming*, 363 U.S. at 615. And based on that context—the structure,

purpose, and history of service-connected disability compensation and the statute that stripped it from incarcerated veterans—it is at least "arguable" that § 5313 amounts to an unlawful bill of attainder, notwithstanding the cursory decisions to the contrary. *Bilal*, 251 F.3d at 1349. The district court therefore erred by dismissing Johnson's claim as frivolous, and this Court must reverse.

## II. The district court erred by dismissing as frivolous Johnson's claim that 38 U.S.C. § 5313 violates the Fifth Amendment's equal protection guarantee.

The district court also erred by dismissing as "frivolous" Johnson's claim that 38 U.S.C. § 5313 violates the constitutional guarantee of equal protection. *See* DE11 at 6-7; DE13 at 2; DE22 at 2. Johnson—a former infantryman with PTSD, not a lawyer—alleged that his equal protection rights were violated because Congress arbitrarily stripped him of a significant right—compensation owed for the injuries he sustained in frontline service of our country—for no rational purpose and out of a desire to harm incarcerated veterans. Based on Johnson's allegations, as well as the equal protection precedent and legal scholarship discussed below, "it is readily apparent that his claim is not wholly without a rational basis in law." *Battle*, 898 F.2d at 129. Accordingly, Johnson's equal protection challenge to § 5313 should be permitted to proceed past the low bar of PLRA frivolity review.

#5076856v1

### A. The Fifth Amendment protects incarcerated veterans from being deprived of significant rights based on irrational classifications and animus.

To analyze the merits of Johnson's allegations, it is helpful to first survey the constitutional protections the Fifth Amendment affords all citizens—even incarcerated felon veterans suffering from service-connected PTSD.

The Fifth Amendment "forbid[s] discrimination" by the federal government that is so "unjustifiable as to be violative of due process." *Moreno*, 413 U.S. at 533 n.5. "Under traditional equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." *Id.* at 532. Although that test is deferential to the government, it is "not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). Rather, equal protection protects against the government's "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."[13] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

---

[13]Although *Olech* was decided under the Fourteenth Amendment's equal protection clause, it applies equally to federal government action under the Fifth Amendment. The United States Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 (1975).

34

Adequately pleading an equal protection claim is not a high bar. As the Supreme Court explained in *Olech*: where a complaint "can fairly be construed as alleging that the [government] intentionally" treated a citizen differently than "other[s] similarly situated" and alleged that such differential treatment was "'irrational and wholly arbitrary,'" such allegations "are sufficient to state a claim for relief under traditional equal protection analysis." *Id.* at 564–65.

Further, equal protection analysis accounts for the government's motives and the significance of the rights affected. Most relevant here, a "bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest." *Moreno*, 413 U.S. at 534. And the significance of the right infringed also matters. Where a right is important to the functioning of society and our democracy (though not "fundamental"), a statute that denies that right in a discriminatory manner "can hardly be considered rational unless it furthers some substantial goal of the State." *Plyler*, 457 U.S. at 223–24; *see also id.* at 230 ("denial" of an important right "must be justified by a showing that it furthers some substantial state interest"). Under this longstanding Supreme Court precedent, Johnson's pleadings readily pass muster.

### B. Even before receiving an appointed lawyer, Johnson alleged an arguable—and plausible—equal protection violation.

Johnson proceeded *pro se* below. Nonetheless, he plausibly alleged that § 5313 violates the Fifth Amendment's equal protection guarantee. Johnson pled the

elements that are "sufficient to state a claim . . . under a traditional equal protection analysis" under *Olech*: that (1) Congress intentionally deprived him of a right; (2) Congress discriminated against him as compared to others similarly situated; and (3) Congress's deprivation was irrational and arbitrary. *See* 528 U.S. at 563–65.

As detailed below, Johnson made these allegations with sufficient substantive support to clear frivolity review. Again, to satisfy the PLRA's frivolity review, Johnson merely had to assert a claim that has "arguable merit." *Bilal*, 251 F.3d at 1349. And even if the Rule 12(b)(6) plausibility standard applied at this stage of the proceedings (it does not), that is also satisfied here. Under that standard, Johnson merely had to allege sufficient facts—which are construed in his favor—to state a claim that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]"). And because Johnson was *pro se*, his pleadings must "be liberally construed" in gauging plausibility. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Id.* (internal quotations marks omitted)).

Johnson's *pro se* complaint sets forth an arguable and plausible equal protection claim. *See* DE1 & DE6.

First, Johnson correctly alleged that Congress enacted 38 U.S.C. § 1110 to pay compensation to disabled veterans regardless of their criminal or incarceration status, excluding such compensation only for certain service-related misconduct. DE1 at 2–3. Here, Johnson suffers PTSD from his service as a Cold War infantryman, during which he witnessed death in a "deadly combat training exercise." *See* DE6 at 1; DE1 at 1–2. Based on his PTSD and tinnitus, the VA rated him at 80% disabled from his military service, rendering him eligible to receive service-connected disability compensation under 38 U.S.C. § 1110. *See* DE6 at 1–2. But given 38 U.S.C. § 5313, Johnson alleged that Congress intentionally deprived him of this disability compensation while incarcerated, contrary to "the due process clause of the Fifth Amendment [and] the Equal Protection Clause of the Fourteenth Amendment[.]" *See* DE6 at 3.

Second, Johnson alleged that § 5313 applies an improper classification, one that "discriminates against incarcerated veterans" compared to other, similarly situated disabled veterans. *See id.* at 5; *see also id.* at 6 (§ 5313 "unconstitutionally . . . lumps incarcerated veterans into a category of vulnerable and/or deviant prisoners" as compared to others not covered by § 5313).

Third, Johnson offered plausible reasons why such a classification was irrational and arbitrary. For instance, Johnson alleged that the purpose of Section 5313 was to "invidiously encroach[]" on the compensation earned through service-

37

connected injury, exacting an improper "punishment" on disabled veterans who are incarcerated. *See* DE1 at 2 & 5. In other words, he alleged that Section 5313 reflects a bare desire to harm incarcerated, disabled veterans. Johnson's *pro se* allegation is sufficient to state an equal protection claim. *See Moreno*, 413 U.S. at 534 ("bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

Johnson also alleged that Section 5313 served no other legitimate government interest. He alleged that the statute deprived incarcerated veterans of compensation for misuse concerns that "is a reality that is on a much larger scale for non-incarcerated veterans" who have "absolutely no compensation reduction levied" against them. *See* DE6 at 5 (prisons operate on cashless systems and thus concerns about misuse or theft of compensation is baseless). He even alleged that the purported "congressional purpose" of Section 5313 bore "no relationship to the circumstances that exist for incarcerated veterans in the Florida Prison System." *Id.*

Johnson may not have drafted his opening pleadings to the same standard as a lawyer. But he is not a lawyer—he is a veteran with PTSD. He pled sufficient factual and legal allegations to state an arguable equal protection violation at this early stage. This Court can and should reverse simply based on the face of Johnson's *pro se* equal protection allegations, which Johnson presented before receiving the benefit of representation by appointed appellate counsel.

38

### C. Johnson's allegations and binding precedent provide an arguable (and plausible) basis for an equal protection claim.

With the benefit of appellate representation, Johnson can now demonstrate the arguable merit of his equal protection claim in a more comprehensive manner. Although Johnson's claim clears the frivolity bar based on the face of his allegations alone, binding precedent and legal scholarship puts the issue beyond doubt.

#### i. The congressional record indicates that Congress enacted § 5313 out of a bare desire to harm incarcerated veterans.

First, it is entirely plausible—not just arguable—that Congress stripped incarcerated veterans of their service-connected disability compensation out of a bare desire to harm those veterans. And where Congress acts with "bare congressional desire to harm a politically unpopular group[,]" that "cannot constitute a legitimate governmental interest[.]" *See, e.g.*, *Moreno*, 413 U.S. at 534.

As detailed above in Section I.B.ii., the congressional record strongly suggests that Congress enacted § 5313 out of a bare desire to harm (and punish) a politically unpopular class of people: disabled veterans who face long-term incarceration for a felony conviction. Again, as Professor Oliva chronicled in her analysis of § 5313, Congress stripped service-connected disability compensation from incarcerated veterans in response to public outrage over a different federal program, SSDI. *See* Oliva, *supra*, at 322 & 331. Sensationalized media stories describing infamous prisoners collecting SSDI benefits caused widespread discontent and furor. *Id.* at

323. Channeling that outrage, members of Congress disdainfully referred to prisoners as "animal[s]," [14] "parasite[s]," [15] and the "least deserv[ing]" "segment of society," [16] and called for the removal of prisoners' federal benefits regardless of whether they had "earned" the benefits "prior to conviction." [17] And "[b]y all accounts, it appears that disabled veterans simply got caught in the wake of" this collective animus towards prisoners. Oliva, *supra*, at 341.

Indeed, that very same animosity was on full display during consideration of the bill that eventually became § 5313. At one hearing, the Director of the Department of Veterans Benefits pushed back against the proposal to strip service-connected disability benefits from imprisoned veterans; he explained that such compensation "is not a direct needs benefit" and has therefore "never been subject to reduction because the veteran's needs are satisfied some other way." *Review of Comp. and DIC Programs Hearing* at 26. But Congressman Montgomery, the principal sponsor of the bill, all but dismissed the Director's informed concerns. His reasoning was both straightforward and openly spiteful: given the recent wave of "publicity," Congress simply could not "let a man in prison who has done horrible, horrible things, draw $800 a month." *Id.*

---

[14] *SSDI Prisoner Beneficiary Hearings* at 8.
[15] *Id.*
[16] *Id.* at 88.
[17] *Id.*

#5076856v1

This legislative record is more than sufficient to support an arguable claim that Congress acted out of a bare desire to harm incarcerated felon veterans when it stripped them of compensation earned for injuries sustained in service of our nation. And that, in turn, is a plausible basis for an equal protection claim under binding Supreme Court precedent. *See Moreno*, 413 U.S. at 534 (law revoking food stamps from hippies irrationally reflected a bare "desire to harm a politically unpopular group").

> **ii.** **Service-connected disability compensation is arguably an important right, which requires the government to show that § 5313 furthers some substantial state interest.**

Second, the service-connected disability compensation that § 5313 took away from incarcerated veterans is an important—even if not fundamental—right. Under Supreme Court precedent, the importance of the right at issue impacts this Court's analysis. Where a law burdens an important right, the Supreme Court instructs that the law "can hardly be considered rational unless it furthers some substantial goal of the State." *Plyler*, 457 U.S. at 223–24.

Under *Plyer*, an important right is one that: (1) is not fundamental because it is not directly granted by the Constitution; but (2) still rises above "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Id.* at 221. The Supreme Court has held that the importance of such a right can be discerned by reviewing: (1) its role in "maintaining our basic

institutions"; (2) its "supreme importance" to the American people, (3) its role in supporting a "vital civic institution," and (4) its role in preserving our "democratic system of government." *See id.* (finding that education is an important right—even for undocumented immigrants). In other contexts, the Supreme Court has emphasized that courts look to "history, legal traditions, and practices" as guideposts for "responsible decisionmaking" regarding the importance of rights. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Under these guideposts, service-connected disability compensation is (at least arguably) an important right.

As discussed above in Section I.B.i., service-connected disability compensation is an important right with a long history and tradition in American society. This compensation is different from ordinary social welfare legislation in important ways. *See Plyler*, 457 U.S. at 221. In particular, while service-connected disability compensation does generally compensate veterans for "impaired earning capacity" by "provid[ing] reasonable and adequate compensation," *Rose v. Rose*, 481 U.S. 619, 630 (1987), it is distinct "from virtually all other federal and state disability benefit programs" because it "refus[es] to consider a veterans' actual employability or pre-disability earnings." Oliva, *supra*, at 314 & nn. 73–74. That is because service-connected disability compensation "is not just economic compensation"; rather, it also functions as "compensation for [the] loss in quality of life" that results from disabilities sustained in the line of duty. VA Office of Policy,

Planning, & Preparedness, *supra*, at 8. That function—compensating for loss in quality of life—is also clear from other structural features of the program, including "certain presumptions of eligibility" and "higher benefit levels for certain disabling conditions such as loss of a limb that reflect humanitarian concern about quality of life." *Id.* at 2.

Service-connected disability compensation is also crucial to our national defense because of its pivotal role in attracting and retaining the citizens who stand watch—risking life and limb—on the front lines. Since its founding, the United States has recognized that delivering promised compensation to veterans who become disabled in the line of duty is central to maintaining our national defense. Thus, "[p]romises of disability payment to wounded soldiers were designed to encourage enlistment in and prevent desertion from the Continental Army." Oliva, *supra*, at 307–08. And again, some historians have even opined that service-connected disability compensation "'probably prevented the dissolution of the Army and the loss of the Revolutionary War.'" Oliva, *supra*, at 308 (quoting Gustavus A. Weber & Laurence F. Schmeckebeier, *The Veterans' Administration: Its History, Activities and Organizations* 5 (1934)). This longstanding tradition of compensating veterans for the bodily sacrifices they make in service of our nation continues through today. *See* Oliva, *supra*, at 307–15. Right now, the military advertises

"Veteran Benefits" to recruit citizens to risk life and limb for our country. *See, e.g.*, https://www.goarmy.com/benefits/veterans (last visited August 24, 2024).

As a result, service-connected disability compensation readily satisfies the *Plyler* criteria for an important right. This compensation is vital to "maintaining our basic institutions"; our military forces serve on the front lines to "preserve our freedom and independence" and our "democratic system of government," and service-connected disability compensation is essential to sustaining those forces. *Plyler*, 457 U.S. at 221 (identifying factors for discerning important rights). Given the vital role that service-connected disability compensation has played in our national defense since the founding, it is certainly arguable that this compensation is an important right that the government can deny only upon "showing that it furthers some substantial state interest." *Plyler*, 457 U.S. at 230. For the reasons discussed in the next section, § 5313 at least arguably fails rational basis review—to say nothing of the substantial state interest standard.

### iii. Under whichever standard—substantial state interest or rational basis—§ 5313 is arguably arbitrary and irrational.

As discussed above, Johnson contends that the standard of review in *Plyler* applies here because service-connected disability compensation is an important right. Johnson further contends that the government cannot show that 38 U.S.C. § 5313 furthers some substantial state interest. But for purposes of this appeal, Johnson shows here that § 5313 is at least arguably *irrational* because it does not further any

#5076856v1

legitimate government interest—which means that it necessarily fails the more discerning "substantial state interest" test from *Plyler* as well.

To begin, the magistrate judge's reasoning for denying Johnson's constitutional claims is that a different magistrate judge previously rejected constitutional challenges to Section 5313. *See* DE11 at 6 (citing *Hutchison*, 2016 WL 7173886, at *4-5). And in that previous case, the magistrate judge relied on *McDermott v. McDonald* to find that a *pro se* prisoner's challenge to § 5313 was frivolous because suspending service-connected disability payments to imprisoned veterans "'is rationally related to . . . preventing duplication of subsistence payments and contraband purchases within prisons.'" *See, e.g.*, *Hutchison*, 2016 WL 7173886, at *5 (quoting *McDermott*, 2014 WL 4435899, at *2).

But as explained in Section I.C. above, § 5313 is *not* "rationally related" to either of these purported goals. *McDermott*, 2014 WL 4435899, at *2. First, service-connected disability benefits are not "subsistence payments" at all, and so stripping them from incarcerated veterans does nothing to prevent "duplication of subsistence payments." *Id.*; *see supra* at 29-30.

Moreover, regardless of whether these payments are "subsistence payments," the purported goal of preventing *duplication* of payments appears to be pretextual— and arguably not a legitimate government interest—because the service-connected disability program was intentionally structured to be duplicative of other payments.

45

As Professor Oliva explains, "disabled veterans are entitled to service-connected disability compensation and SSDI benefit payments *concomitantly and without any setoff* so long as they meet each program's eligibility requirements." Oliva, *supra*, at 338 & nn. 211 & 212 (emphasis added) (collecting authorities). In other words, some veterans "receive benefits *for the same impairment* from both" the service-connected disability program *and* the SSDI program[18]; in those cases, "a veteran collects full monthly compensation from the service-connected program to replace average impairment in earnings as the result of disability and, *in addition*, full monthly SSDI benefits as the result of the *exact same work disability*."[19] And notably, nothing in the service-connected disability statute limits compensation in any way based on any "double-dipping" concerns. *See, e.g.*, 38 U.S.C. § 1110.

Thus, Congress designed service-connected disability compensation to be duplicative. Indeed, Congress passed the service-connected disability compensation statute (38 U.S.C. § 1110) in 1958 (*see* Pub. L. No. 85-857 (1958)), two years after

---

[18] Romina Boccia, *Triple-Dipping: Thousands of Veterans Receive More than $100,000 in Benefits Every Year*, The Heritage Found. Issue Brief No. 4295 (2014), http://www.heritage.org/social-security/report/triple-dipping-thousands-veterans-receive-more-100000-benefits-every-year#_ftn1 (emphasis added); *see also id.* ("It is not illegal for veterans with a disability rating of at least 50 percent, or those receiving combat-related disability compensation, to collect retirement pay from the Department of Defense, disability compensation from the Department of Veterans Affairs (VA), and Social Security Disability Insurance (SSDI) all at the same time.").

[19] Oliva, *supra*, at 338–39 (emphases added).

passing the social security amendments in 1956. This means that Congress recognized it was granting disabled veterans the right to compensation from both the service-connected disability program and the SSDI program. This was not an impermissible "double dip"—it was the intended design of the compensation for disabled veterans.

Therefore, it is at least arguable that § 5313 fails rational basis review: preventing duplication of payments cannot be a legitimate reason for cutting payments that were expressly structured to be duplicative.

Further, stripping service-connected disability compensation from incarcerated veterans to prevent duplication of payments only introduces an *additional* layer of unequal treatment. Specifically: the potential for "double dipping" is an intended feature of the service-connected disability program (as discussed above), *except when it comes to veterans who are imprisoned for felonies*; for those veterans, and only for those veterans, double-dipping is impermissible. That is differential treatment, and it cannot be explained or justified by a desire to prevent duplication of payments.

But this differential treatment *can* be explained by a bare desire to harm a politically unpopular group (*i.e.*, incarcerated veterans), as the legislative history of § 5313 reveals. And that, of course, is arbitrary and illegitimate. *See Moreno*, 413 U.S. at 534. Further, the Supreme Court has held that such discrimination against a

specific, unpopular class cannot be justified on cost-cutting grounds: "Of course, a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler*, 457 U.S. at 227 (*citing Graham v. Richardson*, 403 U.S. 365, 374–75 (1971)).

Section 5313's many exceptions also cast doubt on the notion that it was enacted to prevent duplication of payments. As discussed above, although the statute strips disability compensation from incarcerated felons, it exempts—and therefore allows duplicate payments for—incarcerated misdemeanants, pretrial detainees, those who are confined in mental institutions, those who reside in halfway houses, and those who participate in work-release programs. *See supra* at 27-28. That § 5313 "frequently fails to satisfy its [purported] purpose" of preventing double-dipping further suggests that the statute was enacted for other reasons—namely, out of a bare desire to harm disabled veterans incarcerated for felonies. Oliva, *supra*, at 340.

Second, as explained above, § 5313 bears no rational relationship to preventing "contraband purchases within prisons." *McDermott*, 2014 WL 4435899 at *2; *see supra* at 30. Again, Johnson alleged that there is "no possible way" for service-connected disability compensation to be used to purchase contraband within prison because prisons "ubiquitously operate as a cashless system" where such compensation goes to "prisoners debit cards." DE6 at 5. Accepting those allegations as true, it necessarily follows that taking that compensation away from imprisoned

48

veterans can have no impact on contraband purchases in prison. In other words, §

5313 fails rational basis review because it addresses a purported concern that is no

concern at all. *See Moreno*, 413 U.S. at 535–36 (court will not accept

"unsubstantiated assumptions" as a "rational effort" to address purported concerns).

Moreover, if preventing prison contraband purchases was a rational basis for

stripping service-connected disability compensation from incarcerated veterans,

then presumably Congress would have stripped this compensation from *all*

incarcerated veterans. But that is not what Congress did; rather, § 5313 permits

incarcerated veteran misdemeanants to continue receiving their service-connected

disability compensation while imprisoned. 38 U.S.C. § 5313(a). Congress's illogical

distinction is further proof of its bare desire to harm incarcerated felons. *See Moreno*,

413 U.S. at 534. Beyond that, any legitimate concern about prison contraband is

already addressed by other laws that apply more generally. *See, e.g.*, 18 U.S.C.

§ 1791 (prohibiting and setting punishments for providing and possessing prison

contraband); *Moreno*, 413 U.S. at 536–37 (rejecting argument that food-stamp-

cutting provision addressed fraud concerns because other provisions in the statute

more directly addressed those concerns).

### iv. Section 5313 draws multiple distinctions that are at least arguably irrational.

The discussion above primarily focuses on demonstrating that § 5313

arguably violates equal protection by treating *imprisoned* veterans suffering from

49

service-connected disabilities differently from their *non-incarcerated* counterparts. But to be clear, § 5313 draws *other* distinctions that are also (at least arguably) irrational, and therefore violative of equal protection. As Professor Oliva contends, § 5313 irrationally "distinguish[es] disabled veteran felons, who are subject to benefit stripping, from other classes of disabled, justice-involved veterans who are not." Oliva, *supra*, at 318–22.

For instance, as discussed, § 5313 strips service-connected disability compensation from incarcerated disabled veterans who were convicted of *felonies*, but not from those who were convicted of *misdemeanors*. *See* 38 U.S.C. § 5313(a). This distinction "seems to lack any rational basis." Oliva, *supra*, at 320. The needs-based argument that is routinely cited to rationalize § 5313—*i.e.*, that disabled veterans "do not 'need' VA disability compensation while incarcerated because the government is paying for their room and board"—cannot support the statute's differential treatment of felons and misdemeanants. *Id.* That's because under a needs-based rationale, disability compensation should be stripped from felons and misdemeanants alike; after all, the government covers the basic needs of *both* groups while they are incarcerated. And more generally, even the Supreme Court has acknowledged—almost four decades ago—that "the distinction" between a felony and a misdemeanor "is minor and *often arbitrary*," as "changes" in the categorization of crimes have "made the assumption that a 'felon' is more dangerous

than a misdemeanant untenable." *Tennessee v. Gardner*, 471 U.S. 1, 14 (1985) (emphasis added). "Indeed, numerous misdemeanors involve conduct more dangerous than many felonies." *Id.*

The statute also favors veterans with families over those who are single without dependents; that is, while incarcerated veterans "with dependent family members . . . are entitled to allot their full monthly compensation to those dependents," those without dependents "are entitled neither to allot their compensation to a designated nondependent nor to have their compensation held in trust by the VA while incarcerated." Oliva, *supra*, at 322 (citing 38 U.S.C. § 5313(b)(1)–(3)). Unfortunately, this unequal treatment all but ensures that the "disabled, justice-involved veterans" who lack "significant external supports" are also "the *most* destitute upon their release from prison or jail." *Id.* (emphasis added).

These are just two of the many instances of arguably irrational differential treatment in § 5313. As other examples, the statute exempts (and therefore favors) disabled veteran felons who are eligible and sufficiently able to participate in work-release programs, as well as those who reside in halfway houses, and also those incarcerated in foreign prisons. *See* Oliva, *supra*, at 318 (collecting authorities). But none of those distinctions can be rationalized on a needs-based theory; for instance, veterans who participate in work-release programs already have their needs provided for, just like incarcerated veterans who can't participate in those programs. All these

arguably irrational distinctions further confirm that Johnson's equal-protection challenge to § 5313 is hardly frivolous, contrary to the district court's view.

## CONCLUSION

The district court erred when it asserted frivolity as the basis to close the courthouse doors on Johnson, a disabled *pro se* prisoner suffering PTSD from his frontline service to our nation. The district court's dismissal should be reversed as to Johnson's bill of attainder and equal-protection challenges to his veterans-disability compensation stripped via Section 5313. This case should then be remanded with direction to permit Johnson to serve Defendant with his initial pleadings. The district court can then decide these important constitutional issues in the ordinary course and with the benefit of a more fully developed record.

Respectfully submitted this 28th day of August, 2024.

<div style="margin-left:40%">

*/s/ Jeffrey W. Chen*
Patrick C. Fagan
Georgia Bar No. 387016
fagan@bmelaw.com
Jeffrey W. Chen
Georgia Bar No. 640207
chen@bmelaw.com
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417
(404) 881-4100

*Attorneys for Appellant-Plaintiff*
*Donald F. Johnson*

</div>

#5076856v1

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 11,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on August 28, 2024.

*/s/ Jeffrey W. Chen*
Jeffrey W. Chen

#5076856v1

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties will be served with the foregoing document by the Court's CM/ECF System.

/s/ Jeffrey W. Chen
Jeffrey W. Chen

#5076856v1